UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

RANDY SHERMAN,

Plaintiff, CASE NO: 9:26cv81081

v.

CITY OF RIVIERA BEACH

Defendant.
_______________________________________/

**COMPLAINT**

COMES NOW Plaintiff, RANDY SHERMAN, by and through its undersigned counsel, and sues Defendant, CITY OF RIVIERA BEACH, and in support thereof would show:

**JURISDICTION, AND VENUE**

1. This Court has jurisdiction over Plaintiff's federal claims brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000 *et seq.* ("Title VII).

2. Venue is appropriate in this Court because the Defendant is a Municipality located within the Southern District of Florida, and all events giving rise to Plaintiff's claims occurred in this jurisdictional district.

**PARTIES**

3. Plaintiff, RANDY SHERMAN (hereinafter "SHERMAN"), is a natural person, *sui juris*, and resident of Palm Beach County, Florida.

4. Plaintiff, RANDY SHERMAN, at all relevant times, is and was an employee of the Defendant as defined by Title VII.

5. Defendant, CITY OF RIVIERA BEACH (hereinafter "CITY" or "RIVIERA BEACH") is an incorporated municipality within Palm Beach County, and the Southern District

of Florida, existing under the laws of Florida, with its principal address at 600 West Blue Heron Blvd., Riviera Beach, FL 33401.

6. Defendant, RIVIERA BEACH, is an "employer" within the meaning of Title VII and employs more than 15 employees.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

7. Plaintiff properly exhausted his administrative remedies by filing timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). The EEOC has issued a Notice of Right to Sue to Plaintiff (attached hereto as Exhibit A), and this lawsuit is timely filed.

**GENERAL ALLEGATIONS**

8. SHERMAN is the Chief Financial Officer ("CFO") for RIVIERA BEACH and has been in this role since October 2012 (approximately 14 years).

9. RIVIERA BEACH's municipal website boasts that the "City's longstanding A-bond rating reflects the [finance] department's success."[1]

10. Mr. Sherman is highly educated, experienced and qualified to serve in his role as RIVIERA BEACH's CFO.

11. RIVIERA BEACH is a coastal municipality located in Palm Beach County, Florida.

12. RIVIERA BEACH defines its governance as follows[2]:

> The City of Riviera Beach has a Mayor-Council-Manager form of government, in which the City Council appoints the City Manager as the chief executive officer to manage the day-to-day operations of the city. The City Manager appoints department directors, prepares the budget for the Council's consideration and makes reports and recommendations to the City

[1] https://www.rivierabch.com/finance-dep
[2] https://www.rivierabch.com/elected-officials/council-members

> Council. In this form of government, the members of the City Council act (by voting) as policy makers and fiduciary agents for the city. They are elected for three-year terms according to the district - though they compete citywide. The City Manager and the City Attorney are charter officers and report directly to the City Council. The executive director of the Community Redevelopment Agency reports directly to the City Council as well. The City Council members also sit as the Board of the Community Redevelopment Agency.
>
> The Mayor, in the Mayor-Council-Manager form of government, does not vote. The Mayor has appointment powers in some matters and veto power in other matters. The Mayor through the City Charter also has the authority to take disciplinary action. The Mayor helps solicit residents' views on issues, and helps interpret these views for policy makers. The Mayor is also a key representative in intergovernmental relations.

13. RIVIERA BEACH is a "majority-minority" municipality, with a majority of its residents/voters, elected officials and appointed personnel/employees being black or African-American individuals.

14. Currently, and at all times material hereto, the Mayor (Douglas Lawson), City Manager (currently William Wilkins, formerly Jonathan Evans[3]), four of the five Council Members (currently: Bruce Guyton, KaShamba Miller-Anderson, Shirley Lanier, and Fercella Davis Panier), and the Director of Human Resources and Risk Management (currently Brenda Jenkins, formerly Tennille DeCoste) are all Black and/or African-American individuals.

15. Plaintiff SHERMAN is a Caucasian/hite male.

16. Throughout SHERMAN's employment with the CITY, he has sought to ensure that the public fisc was and is protected against unwise and unnecessary spending.

---

[3] With his contract set to end July 13, 2026.

17. Similarly, he has sought to comply with all requisite state law and CITY rules and policies, including those that have been enacted to prevent taxpayer funds from being spent in a manner intended to benefit a particular official/employee as opposed to the citizens of the CITY.

18. Unfortunately, the CITY has been mired in corruption and controversy for decades, and also has a history of engaging in discriminatory practices against its Caucasian/white employees.

19. As the CITY's CFO, it is both a duty and a point of personal pride for SHERMAN, to uphold the CITY's policies and other applicable rules/law and apply those policies uniformly against all CITY officials and/or employees/personnel, regardless of their race, skin color, national origin, or other protected class.

20. During Plaintiff's tenure of employment with the CITY, Plaintiff has witnessed CITY Officials abuse the public's trust and use CITY funds for improper purposes on many occasions, with the most recent being outlined below.

21. The CITY, by and through various elected officials and employees, have harassed and discriminated against SHERMAN because he is Caucasian/white, and have referred to him as the "white man" multiple times, including at public meetings.

22. Moreover, the CITY is interfering with SHERMAN's ability to carry out his job and duties by disciplining SHERMAN when he attempts to uphold and/or enforce various CITY policies and procedures against CITY officials and/or employee who are Black or African American.

23. Moreover, the CITY, by and through various officials and personnel, have falsely accused SHERMAN of engaging in racist behavior because of the above actions.

24. The opposite is true as time after time the CITY, by and though its officials and employees, harassed, discriminated against, treated differently, and physically threatened SHERMAN, because of his race/skin color.

25. The CITY's animus toward Plaintiff is based on his race and skin color, which is a minority in RIVIERA BEACH.

**Harassment and Discrimination by the CITY's Former Director of Human Resources and Risk Management, Tennille DeCoste**

26. Tennille DeCoste (DeCoste) is a Black and/or African American woman.

27. DeCoste is one of the individuals most involved in the open racist and discriminatory conduct toward and harassment of Plaintiff.

28. Prior to being appointed as the CITY's Director of Human Resources and Risk Management (by then, City Manager, Jonathan Evans), DeCoste was fired by a different municipality, Boynton Beach, for misconduct.[4]

29. Boynton Beach referred DeCoste (its former Human Resource Director) to the Palm Beach County's Office of Inspector General ("OIG") which, in turn, retained outside counsel to conduct an extensive investigation into the multiple alleged ethics violations against DeCoste during her employment at Boynton Beach.

30. That investigation resulted in a "negotiated settlement," wherein the OIG found "probable cause" on two of the nine allegations of wrongdoing, and issued a letter of reprimand"

[4] As summarized in a March 17, 2026 Palm Beach Post Article, DeCoste sued Boynton Beach alleging, in part, that she was fired for reporting a racist comment," specifically, "she was told she was 'hiring too many black women' by [Boynton Beach] officials." The Southern District of Florida dismissed that lawsuit. See Palm Beach Post article: https://www.palmbeachpost.com/story/news/local/boynton/2026/03/17/ex-boynton-beach-official-appeals-racial-discrimination-lawsuit/88905734007/

against DeCoste. See OIC Public Report and Final Order, Case No: C24-021, *In Re: Tennille DeCoste*, dated Dec. 4, 2025.

31. Despite this background, DeCoste was hired by RIVIERA BEACH as its Director of Human Resources and Risk Management.

32. Soon thereafter, it became evident that DeCoste was continuing with her pattern and practice of unethical actions, but now at RIVIERA BEACH (instead of Boynton Beach).

33. Between the summer of 2024 through November of 2024, DeCoste endeavored to hire a friend from her previous employment (at Boynton Beach), Rebeka Harvard.[5]

34. CITY policy requires that prior to hiring for a position, the CITY, through its Council or otherwise, has to approve the position and advertise the position.

35. Ms. Harvard was hired for a position neither approved nor advertised.

36. Further, DeCoste falsely categorized Ms. Harvard as an "independent contractor" even though Ms. Harvard did not qualify for that designation under CITY policy/designations.

37. Plaintiff advised DeCoste of this fact and she became angry and combative with him and not only began to personally harass and discriminate against Plaintiff, but also began a campaign of harassment and discrimination against Plaintiff by encouraging and inducing others to do so as well.

38. Of note, when it came to hiring unqualified individuals and/or individuals for unapproved and/or unadvertised employment positions, DeCoste did not similarly extend herself for white applicants/job seekers.

39. Plaintiff likewise observed inappropriate behavior related to the employment of DeCoste's husband by the CITY.

[5] Upon information and belief, Ms. Harvard testified in DeCoste's behalf in the OIC investigation.

40. Another CITY employee, Stephen Gude (a Black and/or African American, male), was an underling of DeCoste in the Human Resources Department.

41. Mr. Gude was given access to the CITY's online approval process so that he could approve the hiring of DeCoste's husband.

42. Mr. Gude did approve the hiring of DeCoste's husband on Dec. 2, 2024.

43. A few days later, on Dec. 9, 2024, Mr. Gude was promoted to Senior Manager of Human Resources and given an 18% raise.

44. That promotion also did not follow the CITY's hiring or promotion process or policies.

45. Again, the CITY's white employees did not receive similar advancement, treatment or wage increases.

46. Moreover, in March 2025, DeCoste endeavored to hire another friend and former Boynton Beach underling, Ms. Abaroa, also a Black and/or African American woman.

47. First, DeCoste caused the CITY's incumbent risk manager to be terminated.

48. After creating the opening in risk management – and advertising that position for a mere seven days – DeCoste recommended her friend, Ms. Abaroa, for the position.

49. Ms. Abora was completely unqualified for the position.

50. Despite this, DeCoste not only falsely stated Ms. Abora was qualified, she also claimed that Ms. Abora's experience and qualifications merited a salary over the stated minimum salary.

51. Even the CITY Attorney recognized Ms. Aboroa's lack of qualifications for the position and/or salary.

52. Instead of terminating her unqualified friend, DeCoste engineered a different way to keep Ms. Aboroa employed.

53. First, DeCoste terminated another lower-level employee, Jennifer Reyes, under the auspices that her position was being reclassified and she would no longer meet the qualifications of that "new" position.

54. Next, DeCoste moved her friend into that newly vacant position, yet allowing Ms. Aboroa's already inflated/unjustified salary to remain unchanged.

55. Finally, DeCoste upgraded the new position occupied by Ms. Aboroa and recommended she get an even higher salary.

56. The CITY, by and through DeCoste/RIVIERA BEACH's Director of Human Resources, made no such accommodations for similarly situated white or non-Black/African American employees or prospective employees during Plaintiff's extensive employment with the CITY.

57. Plaintiff reported DeCoste's malfeasance to then CITY Manager Evans as her actions violated existing CITY policies and procedures and was discriminatory against white employees and applicants/candidates.

58. Since lawfully reporting DeCoste's wrong and discriminatory actions, she has engaged in retaliatory conduct, including making overtly racial and ageist statements about and in Plaintiff's presence.

59. DeCoste has falsely stated to other CITY officials that by engaging in protected conduct (in reporting her improper and discriminatory conduct), Plaintiff mistreats Black women.

60. Further, DeCoste has bombarded Plaintiff, or caused others to bombard Plaintiff, with hostile emails and memoranda.

61. Likewise, DeCoste enlisted other City employees and officials to carry out a campaign of harassment and retaliation against Plaintiff.

62. Just one example of this occurred during the public, Feb. 4, 2026, Council meeting, wherein a resident accused Plaintiff of improper conduct including the way "Black women were treated."

**Harassment and Retaliation by RIVIERA BEACH Councilman Bruce Guyton**

63. Councilman Bruce Guyton ("Guyton") has previously served terms on the CITY's Council in 1991-1993, 1993-1995 and 2013-2016.

64. Following his most recent tenure on the Council (2013-2016), Guyton plead guilty to a misdemeanor Sunshine Law violation

65. He was most recently re-elected to the CITY's Council in March 2025.

66. According to a March 13, 2026, the Palm Beach Post Article "*The FBI, a massive redevelopment project and, 1,001 questions*," the Post "confirmed that the FBI issued subpoenas" to Guyton, Mayor Lawson and another councilperson (Lanier) "related to the marina project."

**The "Travel Expense" Incident**

67. The present issue with Councilman Guyton began in June 2025 when Guyton sent his legislative assistant to discuss paperwork with Plaintiff regarding Guyton seeking pre-payment/pre-reimbursement for travel expenses.

68. Plaintiff had received specific instructions from (then) CITY Manager Evans to accommodate Councilman Guyton "within the policy."

69. Requisite CITY policy includes:

a. Travel reimbursement request must be timely-submitted with necessary documentation, and the reimbursement check/payment can take 10 (ten) days to process;

b. The CITY cannot reimburse mileage for CITY officials/personnel who have a vehicle allowance (as Guyton has/had); and,

c. The CITY does not reimburse overnight/hotel expenses for travel within a certain distance of the CITY (for example, if it takes less than 3 hours to reach the destination, the employee is expected to drive and return on the same date).

70. Plaintiff advised Guyton's assistant that the last-minute request for immediate reimbursement/travel-advancement could not be made given the above policies.

71. Guyton's assistant had Plaintiff call Guyton directly, which Plaintiff did and explained the above policies.

72. Guyton replied that he did not have to follow CITY policy and hung up on Plaintiff.

73. Guyton, as a CITY official, like all other CITY officials and personnel, is subject to the CITY's policies, whether he likes them or not.

74. Despite this, Guyton called (then) Manager Evans and stated he wanted to arrange a face-to-fact meeting to discuss the denied travel advance payment.

75. The face-to-face meeting between Guyton, Plaintiff and Evans occurred on or around June 11, 2025, wherein, Guyton stated that when he gives a directive, his staff should carry out the directive because "he is the boss" regardless of whether his conduct violates a CITY policy.

76. During this meeting, and seemingly adopting DeCoste's campaign against Plaintiff, Guyton falsely accused Plaintiff of being a racist and a sexist who mistreated Black females employed by the CITY.

77. As Guyton's position as a Councilman did not allow him to discipline Plaintiff directly, he instead threatened Manager Evans (who was Plaintiff's supervisor with the ability to discipline Plaintiff) that if Evans failed to "deal" with Plaintiff, that Guyton would "deal" with Evans.

78. Guyton also asserted that if the incident was reported to Palm Beach County's Office of Inspector General or "Ethics," then "that will have to be dealt with."

79. Guyton followed up on his threat against Evans by sending an "Interoffice Memorandum" to Evans on or around July 2, 2025.

80. This memorandum from Guyton states, in part:

> This interoffice memorandum serves as a written reprimand for your failure to appropriately address the disrespectful and unprofessional conduct of Finance Director Randy Sherman. . . . That is unacceptable. I do not tolerate disrespect. . . Per Section 5(b) of the City Charter, I am notifying you that there is a problem. There is a culture of disrespect that currently exists in the City. Randy Sherman seems to be the center of most of it. . . I am request that you place the reprimand in your personnel file.

81. Guyton continued his harassment of Plaintiff, both directly and through his efforts to force the CITY Manager (then, Evans) to further "discipline" Plaintiff, at the next, public CITY Council meeting on July 16, 2025.

82. While the publicly available agenda for this meeting does not notice the above issue/incident[6], Guyton nevertheless motioned and was allowed to discuss it at the July 16, 2025 Council meeting.[7]

---

[6] Agenda is available at: https://granicus_production_attachments.s3.amazonaws.com/rivierabeach/6c42dd6aca24768bcce7ab0fa43ac2af0.pdf

[7] The video-recording of the meeting is available at: https://www.youtube.com/watch?v=dLrGjCIjY6E

83. Guyton's statements at that public Council meeting confirm that Guyton believed himself exempt from binding CITY policy.

84. When discussing the policy which disallows overnight accommodation reimbursements for travel within a certain distance of the CITY, Guyton curtly states: "I'm not doing that."

85. Next, Guyton took issue with the CITY's policy or practice that it can take up to ten days for the Finance Department to reimburse a travel expense.

86. Guyton was especially critical of this policy since he deemed the amount in question to be insignificant, stating it was less than the amount he spends on "cigars."

87. Next during this public meeting, Guyton turned his attention to Plaintiff and falsely accused Plaintiff of having a disrespectful "tone" during their June 11, 2025 interaction, when in reality, Plaintiff was merely upholding CITY policy, much to Guyton's consternation.

88. Guyton continued the public Council meeting by reading his above referenced "interoffice memo" into the public record and continued his campaign to have Plaintiff reprimanded and embarrassed.

89. Guyton warned Manager Evans that he had two options: either 1) place Guyton's "interoffice memo" into his/Evan's personnel file or; 2) discipline Plaintiff.

90. As shown in the screenshot from the meting below, Guyton concluded his threat by telling Evans that if he failed to follow either of these directives, Guyton would move to terminate his/Evan's contract (as CITY Manager):




**The "Union Meeting" Incident**

91. A short time later, Plaintiff was giving a presentation during a meeting to discuss the police union contract during a closed executive session, which included one of the CITY's outside consultants.

92. During that meeting, Plaintiff and the consultant had a disagreement about the numbers/data which Plaintiff was using in his presentation.

93. Plaintiff advised that the numbers and data had come from the consultant when the consultant had made a similar presentation to a different municipality recently, at which time the consultant became visibly upset with Plaintiff.

94. After the meeting ended, the consultant approached and confronted Plaintiff in a threatening manner, and Plaintiff advised the consultant that he should not get in Plaintiff's face or invade Plaintiff's personal space.

95. The CITY Manager seemingly took Guyton's previous threats to heart because although (former) Manager Evans witnessed the consultant's hostile and threatening behavior, he pretended he did not witness it and did nothing to intervene.

96. Moreover, Manager Evans emailed Plaintiff asking why he had changed the presentation from when that Plaintiff had made the presentation to the staff in the earlier meeting.

97. This was a clear pretext for disciplining Plaintiff as Plaintiff promptly replied that the presentation had not been changed and was, in fact, the same numbers/data Plaintiff had presented earlier, to staff.

98. Two days later, based on his own discriminatory animus and also adopting the discriminatory pressures of Councilperson Guyton and HR Director DeCoste, Mayor Douglas Lawson sent Plaintiff a "Notice of Suspension," cut and pasted below:

Riviera Beach

OFFICE OF THE MAYOR
Douglas A. Lawson
City of Riviera Beach, Florida

September 12, 2025

**Mr. Randy Sherman**
Chief Financial Officer
City of Riviera Beach

**Subject: Notice of Suspension**

Dear Mr. Sherman,

This letter serves as formal notice of your suspension from your duties as Chief Financial Officer with the City of Riviera Beach. This action is taken pursuant to the authority granted to the Mayor under the **City Charter of Riviera Beach**, which empowers the Mayor to suspend city employees for cause.

Your behavior following the recent closed session with our labor attorney was unacceptable and inconsistent with the standards of professionalism expected of your role. This interaction did not reflect the respect, accountability, and decorum required of senior leadership within the City of Riviera Beach.

The City of Riviera Beach **Bill of Rights** emphasizes our collective responsibility to uphold transparency, accountability, and respect in government service. Your actions fell short of these principles and did not reflect the standards required of our leadership team.

Accordingly, effective 8:00am **on Friday, September 12, 2025**, you are suspended from your duties for a period of **three (3) business days**. During this time, you are prohibited from performing any functions, making representations, or exercising any authority associated with your position as Chief Financial Officer.

This suspension is intended to protect the integrity of City operations and reaffirm the professional standards expected of all members of senior leadership. Upon your return, it is expected that you demonstrate conduct consistent with the values of the City of Riviera Beach and the responsibilities entrusted to you.

Sincerely

Douglas Lawson

**Mayor Douglas Lawson**
City of Riviera Beach

600 West Blue Heron Boulevard | Riviera Beach, FL 33404

99. The suspension was carried out in a manner that was intended to be as humiliating and embarrassing as possible.

100. Manager Evans prepared a memorandum to finance staff and sent it via email instructing that Plaintiff was to be locked out of any City related operations, all payments and

approvals that would require Plaintiff's signature were to be halted, and Plaintiff was to be locked out of his emails.

101. Further, the Finance Department employees were advised they were to keep the matter "confidential," even though the CITY is subject to Florida's public records law and both Mayor Lawson and Councilman Guyton were both public officials.

102. Further, the matter was never to be confidential as, according to Section 15 of the City Charter, while the Mayor does have the authority to suspend any CITY officer or employee, the matter must be voted on by the Council, as follows:

> The mayor shall have power to suspend any officer or employee of the city, except members of the council, for misconduct in office or neglect of duty, but shall report his/ her action in writing to the council with the reasons thereof at the next regular meeting of the council for its approval or disapproval, and the said officer or employee shall stand and remain suspended only upon the approval thereof by a majority vote of the council, and upon disapproval thereby, shall receive his/ her compensation for the time during which he/ she was suspended.

103. The CITY and Mayor caused Plaintiff to be suspended prior to a public hearing and vote by the Council. African American employees who act in a manner which is unprofessional or lacking in decorum consistently receive more favorable disciplinary outcomes – often receiving no discipline at all.

104. Moreover, on top of the suspension, the CITY also gave Plaintiff a written reprimand. Again, by doing so the City treated the Plaintiff less favorably than other, similarly situated, African American employees.

105. The suspension by Mayor Lawson on the purported basis of lack of professionalism, respect, decorum, and leadership was and is especially poignant given Mayor Lawson's controversial background.

106. Just a year earlier (in 2024), while serving as a Councilman, Lawson got into a brawl with another (then) Councilman immediately following a public Council meeting, in the CITY's headquarters.

107. The Palm Beach Post reports that as to both Lawson and the other Councilman (McCoy), the police "found probable cause to charge both councilmen with simply battery [but t]he agency gave them the option of pursuing charges but both declined."[8]

108. A few years earlier than that (in August 2021), Mayor Lawson, while then a sitting RIVIERA BEACH Councilmember, was arrested under probable cause for domestic violence against his fiancé.

109. There was a local controversy over the fact that Lawson was "unarrested" by the Riviera Beach police chief but, ultimately, the State Attorney found that there was probable cause for the domestic battery arrest but charges were not filed because Lawson's fiancé did not pursue charges.[9]

110. Significantly, despite the severe lack of professionalism, decorum, and respect in government exhibited by Lawson (and the other Councilman, McCoy) in these events, neither of these Black/African American men were admonished, disciplined, or suspended in any manner.

---

[8] See Palm Beach Post Article, *Riviera Beach candidates blast lawsuit challenging how they paid campaign filing fee* (Dec. 26, 2024).

[9] According to a WPTV News broadcasts report, RIVIERA BEACH police chief thereafter ordered the probable cause affidavit to be changed and for Lawson to be "unarrested." The reporting continues with an interview of head of the Palm Beach County Police Benevolent Association (Union) calling for an outside investigation into the RIVIERA POLICE Chief for unarresting Lawson given the original probable cause affidavit and surveillance of the incident and firing of veteran police captain who made the original arrest/probable cause affidavit. The WPTV News reporting also makes the surveillance video of the incident available at: https://www.youtube.com/watch?v=-k58UUQV7Xo. Also see: https://www.wptv.com/news/region-c-palm-beach-county/riviera-beach/state-attorney-says-domestic-battery-arrest-of-riviera-beach-councilman-valid-but-no-charges-will-be-filed

111. At the Sept. 17, 2025 public Council meeting, the Mayor discussed his Notice of Suspension and a vote was taken, upholding the three-day suspension.

112. When the Finance Department employees learned of Plaintiff's suspension, they decided they would speak in Plaintiff's favor at the Council meeting (in an effort to get the Council to vote against the suspension).

113. Manager Evans discovered the Finance Department employees' plan to speak on Plaintiff's behalf and under the guise of "advising" them on their right to free speech cautioned them against speaking out in a manner which would seem "political".

114. Despite the implicit warning, Plaintiff's finance team stood together in solidarity for Plaintiff, with the Assistant to the Director of Finance (Brooke Eadicicco) speaking on their behalf, and advising the Council that Plaintiff is a "person of integrity, dedication and commitment." See screenshot from the Finance Department team's statements in support of Plaintiff below.




115. As is demonstrated in the above screenshot from the Sept. 17, 2025 meeting, a majority of the Finance Department employees (who stood in support of the Plaintiff and against his suspension) are non-white individuals.

116. Manager Evans sent a written reprimand to Brooke Eadicicco, (incidentally, a non-Black/African American Finance Department employee who spoke/stood in support of Plaintiff), stating that her act of speaking was a violation of the City's progressive disciplinary policy because the statements were insubordinate, disrespectful, and constituted defiance and a refusing to carry out directives – all because she indicated that an "injustice" had been done in regard to Plaintiff's suspension and asking the CITY Council to vote against upholding the suspension.

117. Manager Evan's written reprimand of Brooke Eadicicco violated her right to free speech.

118. Plaintiff's discipline/suspension was a matter of public concern and Ms. Eadicicco's statements were made at a public hearing, during the public comment period (i.e., First Amendment protected free speech).

119. Manager Evans even acknowledged that Ms. Eadicicco's speech did not impact the CITY's ability to effectively and efficiently fulfill its responsibilities – he acknowledged in his written reprimand that he was concerned that her speech "could" be perceived as political or as undermining the authority of decision makers.

120. Furthermore, in addition to the wrongful suspension, written reprimand, and public humiliation/embarrassment, the CITY also subjected the Plaintiff to anger management training.

121. Importantly, despite Mayor/(former) Councilman Lawson and (former) Councilman McCoy's public brawl right outside the CITY Council meeting room (within the CITY's public building), as well as Lawson's domestic battery arrest while a sitting Councilman, these men were never subject to any disciplinary actions, much less a suspension.

122. Unfortunately, the harassment and discrimination against Plaintiff did not stop there and, instead, Guyton continued to dredge up the previous "offense" at multiple subsequent public Council meetings.

123. For instance, during the CITY's February 4, 2026, public Council meeting, Guyton raised the fact that Plaintiff was white, specifically stating:

> I talked about the tension white and black that exists now. Mr. Randy Sherman has been very disrespectful to a lot of employees . . .

124. Seemingly recognizing and concerned about this line of discussion, immediately after Guyton made the above statements, Council Vice-Chair Lanier questioned the CITY Attorney whether the Council, via Guyton, and especially given Plaintiff's demand letter (sent to CITY in January 2026), should be discussing Plaintiff in this manner. The Attorney responded that it was

only a demand and not a lawsuit, and the CITY does not "censor their council" thereby approving the continued reprimand, embarrassment and public announcement of false facts regarding Plaintiff.

125. Mr. Guyton jumped back in to this colloquy, stating he had the right to discuss "facts" and then continued that "one of the problems we've had in our city, we haven't been transparent with our residents."

126. As referenced above, Guyton previously plead guilty to a misdemeanor Sunshine Law violation, for conducting official City business outside of view of the public, breaking the legal requirement for transparency.

127. Upon information and belief, Guyton suffered no discipline for his Sunshine law (aka, transparency) violation.

128. Guyton resumed his statements (at the Feb. 4, 2026 Council meeting) regarding Plaintiff and again restated the same story he told at earlier Council meetings regarding Plaintiff allegedly disrespecting him/Guyton (related to the travel reimbursement policies) and the false information about the union meeting.

129. Guyton again brought the Plaintiff's skin color/race/national origin into the conversation/discussion which had no bearing on these issues other than a discriminatory purpose. See the screenshot below.




130. Further, Guyton continued to accuse the Plaintiff of acting improperly and falsely stated that Manager Evans did not discipline Plaintiff, as Guyton had earlier threatened Evans to do. Mr. Guyton rhetorically asked what Mr. Evans did to discipline Plaintiff (in relation to the "union meeting") and answered his own question: "Not a thing." Councilman Guyton also made public statements comparing the Plaintiff's transgressions (i.e. a lack of "decorum" and "professionalism") to the transgressions of an African American fire department employee who received more stringent discipline, despite the dissimilarities of their misconduct (the fire department employee in question had been involved in an incident where his alleged mismanagement resulted in a drowning death).

131. As set forth above, Guyton's statements during the public, Feb. 4, 2026 Council meeting were blatantly false on multiple fronts, most significantly that Plaintiff had been

suspended without pay in September 2025 specifically related to that "union meeting" alleged conduct, and would continue to receive additional adverse employment actions.[10]

132. Further, Manager Evans, as discussed above, placed a written reprimand in Plaintiff's personnel file and likewise required Plaintiff to attend anger management counseling. Further, Manager Evans sent the purposely embarrassing email to Finance staff advising that Plaintiff would be cut out of all operations for his suspension period, and then issued reprimands to Plaintiff's underlings when they spoke in support of him at the September 2025 Council meeting.

133. Guyton (at the February 2026 Council meeting) then pivoted to his consternation related to the CITY's treatment of its Assistant Fire Chief Kieth Golden compared to its treatment of Plaintiff, who (as shown above), Guyton continues to falsely claim had not been disciplined.

134. Fire Chief Golden had overseen a botched water rescue of an unconscious man who had driven his vehicle into a canal within the CITY.

135. Under Golden's leadership and direction, his firefighters broke open a window and opened a door to the floating car, causing it to immediately sink, and the person inside that vehicle drowned.

136. The CITY launched multiple investigations (upon information and belief, both internal and external) into Chief Golden's actions related to that incident and his leadership in general, including his failure to have water rescue training for the CITY's Fire Department, and suspended him.

[10] After making this statement Guyton says the "mayor had to step in" and then does admit that Evans sent Plaintiff "to training."

137. Thus, during the February Council meeting, Guyton, amazingly, sought to compare Plaintiff's "disrespect" (which was false for the reasons stated above) during the "travel expense" encounter and "union meeting," with Chief Golden's multiple serious infractions which lead to the drowning death of an innocent man.

138. As demonstrated by the screenshots below, during this public Council meeting, Guyton continued to bring Plaintiff's race/skin tone – which had absolutely no bearing on the issues at hand - into the discussion.

139. Guyton's continued statements regarding Plaintiff's race/skin tone are a clear demonstration of the CITY's animus and treatment of Plaintiff.






140. Guyton continued with the same line of attack against Plaintiff during the March 18, 2026, Council meeting, stating that Plaintiff was at the center of what was "out of control" with the CITY.

141. As shown in the screenshots below, Guyton continues with his harassment of Plaintiff, including stating falsely again that the Plaintiff had not been disciplined.


Riviera Beach
Council Meeting
13b. City Manager's Contract
March 18, 2026
The common denominator of many of those
out of control


Council Meeting
13b. City Manager's Contract
March 18, 2026
Randy Sherman has been able to do
whatever he wanted to do, how




**COUNT I**
**(Title VII Race/Skin Color Discrimination)**

142. SHERMAN adopts and realleges paragraphs 1 - 141 as if fully set forth herein.

143. RIVIERA BEACH is a majority-minority jurisdiction.

144. Plaintiff is a white male, and a member of a protected class.

145. At all times material hereto, Plaintiff was an "employee" within the definition of Title VII.

146. At all times material, the CITY was an "employer" within the definition of Title VII.

147. During the course of his employment, and as more fully described above in paragraphs 8-141, Plaintiff was and is being subjected to harassing and discriminatory behavior because of his race and/or skin color.

148. RIVIERA BEACH by and through its elected officials and other high-level employees and personnel, engaged in the offensive and discriminatory statements and conduct because Plaintiff is a white/Caucasian, male.

149. RIVIERA BEACH's discriminatory behavior is part of a pattern and practice of unlawful harassment and discrimination of white/Caucasian employees.

150. The discrimination was and is severe and pervasive, and altered the terms and conditions of Plaintiff's employment with CITY. To exacerbate matters, the CITY has never had an effective anti-discrimination policy which it effectively enforced. Indeed, the CITY'S highest ranking officials engaged open, and racially hostile, behavior from the Council Chamber dais. That discriminatory attitude had long permeated the CITY'S governance, including its discrimination policy which was used either as a tool by employees to avoid discipline (often with political cover from a superior such as a Department Head, Council Person, City Manager, or Mayor), employees who complained were retaliated against, or else employee complaints were swept under the carpet with little or no discipline.

151. Plaintiff suffered severe adverse employment actions because of his race/skin color including his suspension, reprimand and mandatory training.

152. As part and natural consequence of the campaign of harassment and discrimination by the CITY's elected officials and other high-level employees and personnel, other CITY employees and members of the public have joined in the harassing and discriminating rhetoric and treatment of Plaintiff, including at public meetings.

153. As a direct and proximate result of the harassing and discriminatory conduct, Plaintiff has suffered lost wages, as well as suffered humiliation, embarrassment, emotional harm and damage to his professional reputation.

154. Plaintiff's damages are ongoing and continuous in nature.

WHEREFORE, Plaintiff requests that this Court:

a. Enter judgment for Plaintiff for Defendant's violation under Title VII;

b. Enter judgment awarding Plaintiff for his actual damages as provided for under Title VII, including lost wages and back pay;

c. Enter judgment awarding Plaintiff for his compensatory damages as provided for under Title VII, including emotional distress, humiliation, embarrassment, anxiety and related damages, which Plaintiff continues to suffer;

d. Award Plaintiff his reasonable attorney's fees and costs;

e. Award injunctive relief, thereby enjoining the CITY and/or any of its employees or elected officials from further harassing, discriminating against and/or retaliating against Plaintiff

f. Any other relief this Court determines to be fair and reasonable

**COUNT II**
**(Title VII Race/Skin Color Hostile Work Environment)**

155. SHERMAN adopts and realleges paragraphs 1 - 141 as if fully set forth herein.

156. RIVIERA BEACH is a majority-minority jurisdiction.

157. Plaintiff is a white/Caucasian man, and a member of a protected class.

158. At all times material hereto, Plaintiff was an "employee" within the definition of Title VII.

159. At all times material, the CITY was an "employer" within the definition of Title VII.

160. During the course of his employment, and as more fully described above in paragraphs 8-141, Plaintiff was and is being subjected to harassing and discriminatory behavior because of his race and/or skin color.

161. RIVIERA BEACH by and through its elected officials and other high-level employees and personnel, engaged in the offensive and discriminatory statements and conduct because Plaintiff is a white/Caucasian, male.

162. The unwelcome, offensive and discriminatory conduct alleged above created a discriminatory and hostile working environment.

163. RIVIERA BEACH's discriminatory behavior is part of a pattern and practice of unlawful harassment and discrimination of white/Caucasian employees.

164. Similarly situated employees, who are not white/Caucasian, employed by Defendant are not and have not been subjected to the same conduct referenced above.

165. The harassment was and is severe and pervasive, and altered the terms and conditions of Plaintiff's employment with CITY. To exacerbate matters, the CITY has never had an effective anti-harassment policy which it effectively enforced. Indeed, the CITY'S highest ranking officials engaged open, and racially hostile, behavior from the Council Chamber dais. That discriminatory attitude had long permeated the CITY'S governance, including its harassment policy which was used either as a tool by employees to avoid discipline (often with political cover from a superior such as a Department Head, Council Person, City Manager, or Mayor), employees who complained were retaliated against, or else employee complaints were swept under the carpet with little or no discipline.

166. As a direct and proximate result of the harassing and discriminatory conduct, Plaintiff has suffered lost wages, as well as suffered humiliation, embarrassment, emotional harm and damage to his professional reputation.

167. Plaintiff's damages are ongoing and continuous in nature.

WHEREFORE, Plaintiff requests that this Court:

a. Enter judgment for Plaintiff for Defendant's violation under Title VII;

b. Enter judgment awarding Plaintiff for his actual damages as provided for under Title VII, including lost wages and back pay;

c. Enter judgment awarding Plaintiff for his compensatory damages as provided for under Title VII, including emotional distress, humiliation, embarrassment, anxiety and related damages, which Plaintiff continues to suffer;

d. Award Plaintiff his reasonable attorney's fees and costs;

e. Award injunctive relief, thereby enjoining the CITY and/or any of its employees or elected officials from further harassing, discriminating against and/or retaliating against Plaintiff

f. Any other relief this Court determines to be fair and reasonable

**COUNT III**
**(Disparate Treatment in Disciplinary Practices)**

168. SHERMAN adopts and realleges paragraphs 1 - 141 as if fully set forth herein.

169. RIVIERA BEACH is a majority-minority jurisdiction.

170. Plaintiff is a white/Caucasian man, and a member of a protected class.

171. At all times material hereto, Plaintiff was an "employee" within the definition of Title VII.

172. At all times material, the CITY was an "employer" within the definition of Title VII.

173. During the course of his employment, and as more fully described above in paragraphs 8-141, Plaintiff was and is being subjected to harassing and discriminatory behavior because of his race and/or skin color.

174. RIVIERA BEACH by and through its elected officials and other high-level employees and personnel, engaged in the offensive and discriminatory statements and conduct because Plaintiff is a white/Caucasian, male.

175. RIVIERA BEACH's discriminatory behavior is part of a pattern and practice of unlawful harassment and discrimination of white/Caucasian employees.

176. Defendant took multiple and severe adverse employment actions against Plaintiff as more specifically set forth.

177. Plaintiff was disparately and more harshly disciplined, publicly reprimanded and suffered more extreme adverse employment actions because of his race/skin color.

178. The CITY's similarly situated employees, who are not white/Caucasian, have not been subjected to the same discipline, public reprimand and/or adverse employment actions for similar or worse conduct.

179. Further, the conduct Plaintiff was accused of committing as a pretext for disciplining and/or publicly reprimanding him for were unfounded or untrue.

180. As to (former) Director of Human Relations, Tennille DeCoste, Plaintiff reporting her multiple violations of CITY policy to (then) Manager Evans was truthful and justified as

evidenced by the fact that the CITY ultimately investigated her and fired her for these and other offenses.[11]

181. Likewise, Plaintiff had a valid reason for rejecting Councilman Bruce Guyton's request for immediate and/or upfront/advancement on travel expenses as that request violated multiple CITY policies as specified more above.

182. Tellingly, at a subsequent Council meeting, Guyton reiterated his belief that those policies should not apply to him, but of course, they do.

183. Plaintiff was not at liberty to bend those policies for Guyton, and his refusal to do so was not "disrespectful."

184. Likewise, as to the "union meeting," Guyton's recitation of these facts is false. Plaintiff was using correct information (that the outside consultant had recently utilized with a different municipality) and the information presented by Plaintiff was the same information he had previously presented to staff (i.e., it had not been changed as Guyton and the Mayor alleged).

185. The harassment was and is severe and pervasive, and altered the terms and conditions of Plaintiff's employment with CITY.

186. As a direct and proximate result of the harassing and discriminatory conduct, Plaintiff has suffered lost wages, as well as suffered humiliation, embarrassment, emotional harm and damage to his professional reputation.

187. Plaintiff's damages are ongoing and continuous in nature.

---

[11] DeCoste has recently filed a race discrimination lawsuit against RIVIERA BEACH and the CITY's Motion to Dismiss that Complaint provides that it "discovered [DeCoste] was destroying public records, falsifying reports and engaging in serious policy violations" and then terminated [DeCoste] when [the CITY] ha[d] clear evidence of the misconduct." See CITY's Motion to Dismiss, filed 8/19/26 in *DeCoste v. City of Riviera Beach*, Case No. 2026-CA-008443XXXAMB, in the Circuit Court of the Fifteenth Judicial Circuit in and for Palm Beach, County, Florida.

WHEREFORE, Plaintiff requests that this Court:

a. Enter judgment for Plaintiff for Defendant's violation under Title VII;

b. Enter judgment awarding Plaintiff for his actual damages as provided for under Title VII, including lost wages and back pay;

c. Enter judgment awarding Plaintiff for his compensatory damages as provided for under Title VII, including emotional distress, humiliation, embarrassment, anxiety and related damages, which Plaintiff continues to suffer;

d. Award Plaintiff his reasonable attorney's fees and costs;

e. Award injunctive relief, thereby enjoining the CITY and/or any of its employees or elected officials from further harassing, discriminating against and/or retaliating against Plaintiff

f. Any other relief this Court determines to be fair and reasonable

**Demand for Jury Trial**

188. Plaintiff requests a trial by jury on all issues so triable.

Dated: August 31, 2026

Respectfully submitted,

**XENICK LEBEDEKER PEPIN**
*Counsel for Plaintiff*
1615 Forum Place, Suite 3B
West Palm Beach, FL 33401
Telephone: (561) 659-7700
Fax: (561) 659-6377

*/s/ Megan M. Wegerif*_______
Megan M. Wegerif, Esq.
FBN: 86271
mmw@XLPlawfirm.com

Bernard Lebedeker, Esq.
FBN: 0042950
bal@XLPlawfirm.com